ALBANY & BOSTON MINING CO. v. AUDITOR GENERAL ET AL.

*Injunction to Restrain Tax Sale.*

Injunction will not lie to perpetually restrain sales for delinquent taxes where no inequality or injustice is pretended, and relief is asked for mere legal irregularities such as that the assessment roll was not ready for review on the day prescribed by statute.

Equity will not restrain the collection of a tax where it does not appear that the property was exempt from taxation, or that the levy was without legal power, or that the persons imposing it were unauthorized, or that they proceeded fraudulently.

Appeal from Houghton. Submitted June 14. Decided October 23.

INJUNCTION to restrain collection of tax. The facts are in the opinion.

*T. L. Chadbourne, Ashley Pond* and *Hoyt Post* for complainant. If an assessment is not made at the statutory

time, all subsequent steps are void, Cooley on Taxation, 216; *Clark v. Crane*, 5 Mich., 151; *Hoyt v. East Saginaw*, 19 Mich., 39; it cannot be made afterwards, *Wilcox v. Humphrey*, U. S. Dist. Ct., W. Dist. Mich.; nor left in parol, *Moser v. White*, 29 Mich., 59; and an assessment roll made by altering over that of a previous year is not competent evidence, *Ferton v. Feller*, 33 Mich., 199. The validity of the assessment being a jurisdictional fact, *Kinyon v. Duchene*, 21 Mich., 498, 501, the equities of the party assessed are as great as if the assessor's functions were usurped, Cooley on Taxation, 186, and n. 1, and cannot be affected unless he waived the defect, *Motz v. Detroit*, 18 Mich., 495.

*T. M. Brady* and *C. I. Walker* (on brief) for defendants.

MARSTON, J. Complainants filed their bill to restrain defendants, the Auditor General and county treasurer, from selling certain lands for delinquent taxes. An answer was put in, proofs taken, and the relief prayed for granted.

The important facts in this case are as follows: Isaac M. Rhodes was supervisor of the township of Franklin in 1873 and 1874. Instead of making a new assessment roll for 1874 in the usual manner, he took the original assessment roll for 1873, which was in his office, and with a blue pencil made such changes and alterations thereon in valuation and otherwise as he deemed necessary. All such changes were made prior to the third Monday of May, 1874, and the roll of 1873 thus altered in fact constituted the roll for 1874, no changes having been made thereon after the time fixed for a review of the same in May, except to add one name with a tax of personal property. After the time fixed by law for a review of the assessment roll, the supervisor then made a copy of this roll, to which copy he attached his certificate as required by § 991 of the statute, and the copy so made and certified to, stood henceforth as the roll for 1874.

The real question, then, in this case is whether a person whose real estate has been assessed in this manner can, for this reason alone, come into a court of equity and enjoin

perpetually the sale of his lands for the collection of the taxes so assessed, without paying or offering to pay any part of the same?

It must be conceded in the outset that it was highly improper, if not criminal (2 Comp. L., § 7751) for the supervisor to make any changes, alterations or additions in or to the original assessment roll of 1873, required by law to be kept on file in his office. This cannot, however, in my opinion, avail the complainants. They are in no way prejudiced in this case on account thereof. Had the supervisor in the first instance taken the roll for 1873 and made a literal copy thereof, and then adopted the copy so made, with the necessary changes, as in this case, in order to make it an assessment roll for 1874, I do not well see how the complainants could be injuriously affected thereby or claim that an assessment so made would be absolutely void. And yet as to them wherein lies the distinction? The statute prescribes the method to be adopted by supervisors to procure a complete list of the taxable property within their several townships, and they are required immediately thereafter to proceed and examine the property, and estimate and set down the true value thereof. The statute farther prescribes that on the third Monday in May, and so on the next two following days, the supervisor shall be present at his office, at certain hours, for the purpose of reviewing his assessment, which then consists of descriptions and valuations only, including, of course, names of owners of property described, where necessary, and on the request of any person, his agent or attorney, considering himself aggrieved, on sufficient cause being shown to the satisfaction of the supervisor, he shall alter the assessment as to the valuation thereof, as shall to him appear just and equal. §§ 986, 987.

For all the purposes of this review, parties whose property was assessed could at the time fixed obtain as full and accurate information from the assessment roll for 1873, as altered, as they could had a copy of the same been made and then altered, or an entirely new assessment been made without any reference whatever to the roll for 1873. The roll as changed and as exhibited at that time, no longer

stood as the roll for 1873, for that purpose, and as it then stood it was the roll for 1874, and the fact that it became necessary, after the supervisor had reviewed and completed this roll, for him to make a literal copy thereof, to which his certificate should be attached, and which should afterwards be examined by the board of supervisors, equalized and certified to by their chairman, and which should thereafter be and remain the original roll for 1874, would not, in my opinion, render such roll or the taxes afterwards assessed upon the basis thereof illegal and void. It may frequently become necessary, on account of the imperfect manner in which the assessment is first made, and the changes and corrections made during the review thereof, that a new roll or copy should be made and used thereafter as the original roll, and I should hesitate to hold, where such a necessity existed, in the opinion of the supervisor, and a legible and correct copy thereof had been made and adopted and used thereafter as the assessment roll, that third parties with no other foundation to stand upon, could, with the aid of a court of equity, escape the payment of their just proportion of the public burthens.

It is urged in the brief of counsel in this case that the abuses to which the course adopted in this case would lead are obvious; that the supervisor could readily alter the assessment fraudulently after its inspection, and detection of such alteration would be difficult, and that he might readily forget what assessment he had made and innocently alter it. In so far as any change or alteration in the record for 1873 is concerned, the abuse is obvious and could not be justified, but as already said, this is not the proper proceeding to punish that abuse, so long as complainants do not show how it injuriously affected their rights in the assessment in question. To punish the supervisor for tampering with a public record is one thing, but it does not necessarily follow that such changed record could not be made the basis upon which a valid assessment roll could be made out in favor of the State, county and other municipalities. The punishment cannot be extended so far as to deprive them of all rights in a proceeding of this kind.

The other abuses referred to, even if likely to arise in such a case, may also where no such course has been adopted. Such an argument, however, does not go to the validity of the tax in this proceeding, especially where no such abuses are even hinted at in this case. We cannot assume that such an abuse will ever become the practice in this State, or grant the relief prayed for upon the theory that should such a practice be adopted, evils, now imaginary, may hereafter arise. "Sufficient unto the day is the evil thereof."

We need not, however, dispose of this case upon the grounds already stated. There is, in my opinion, still another clear and distinct ground for refusing the relief prayed for.

The complainant does not deny ownership of the property assessed, or allege that the taxes assessed against their property, and the collection of which they are seeking to enjoin, are otherwise illegal, excessive or unjust, or that there would be any thing inequitable in requiring them to pay the full amount thereof as their just proportion of a common public burthen. They come into this court upon a purely legal objection, one which, even if valid to the full extent claimed, in no way increased the amount of the taxes assessed against their property, or added to their burthens or deprived them of any just right which they otherwise would have had. Having thus placed themselves upon a strictly legal objection, ought they not to have availed themselves of the remedy which a court of law would have given them, where, if their position is correct, they would have obtained full and complete redress without in any way affecting the rights and interests of the public in the other assessments, instead of coming into a court of equity for a process which in fact would prevent the payment of taxes by parties who otherwise would have made no complaint? The personal consequences are not the only ones which must be kept in view in this class of cases where a remedy by injunction is sought for to prevent the collection of the tax. "When the illegalities complained of affect only the person complaining, an injunction which restrains the collection as to him may cause no considerable mischief, and may very properly be

awarded if a sufficient case is made out; but when they affect the whole tax levy, as they often do, a court should be extremely cautious in awarding, on the complaint of one person, or even of several, a process which may reach the cases of others not complaining, and which may seriously embarrass all the operations of the government depending on the source of revenue which by means of it would be stopped." Cooley on Taxation, 536. As was said in *Eve v. State*, 21 Ga., 50, "How could a government calculate with any certainty upon the revenues, if the collection of the taxes was subject to be arrested in every instance in which a tax-payer or tax collector could make out *prima facie* a technical case for arresting such collection? Far better is it * * to let the individual pay to the government what it demands of him, at the time of the demand, as he will be certain of getting it back with interest, after more or less delay, if it was not due." The principle here contended for has been acted upon in this court upon several occasions, and in my opinion must when applied dispose of this case. *Merrill v. Humphrey*, 24 Mich., 170; *Pillsbury v. Auditor General*, 26 Id., 245.

A rule was laid down at an early day in this State which has since then substantially been incorporated into our tax laws as follows: "No general or special tax authorized to be raised by the laws of this State, and which shall be assessed upon any property in any township or ward within the State, shall be held illegal or invalid for want of any matter of form in any matter or thing not affecting the merits of the case, and which shall not prejudice the rights of the party assessed." 1 Comp. L., § 1129. I think this provision should receive such a construction as would carry out the evident intent of the Legislature, and which would not permit technical omissions, errors or abuses, not affecting the merits of the case, and which did not prejudice the rights of the party assessed, to relieve him from the payment of his just proportion of the public revenue. No injury can result to the individual from such a course, and the public interests will be better subserved thereby in a more prompt collection of the taxes.

I am of opinion that the decree below should be reversed and the bill dismissed with costs of both courts.

COOLEY, C. J.   This is a bill to enjoin the collection of a tax. The only ground for relief which is assigned is, that the supervisor did not have his roll ready for review on the third Monday of May as is required by law. It is not pretended that there has been an excessive valuation or any unauthorized levy; but relief is demanded and has been obtained on the sole ground of the irregularity mentioned.

So far as I am aware this is the first instance in the judicial history of the State in which equity has interposed to relieve a tax-payer from his burden where inequality or injustice was not pretended, and only a legal objection was relied upon.   *Palmer v. Rich,* 12 Mich., 414, and *Kinyon v. Duchene,* 21 Mich., 498, were cases in which there was no jurisdiction to levy any tax at all.   *Motz v. Detroit,* 18 Mich., 495, was a case in which the statute as to a part of the levy was defective, because it provided for no apportionment, and therefore in our view provided for no tax. *Scofield v. Lansing,* 17 Mich., 437, was also one in which the objection went to the jurisdiction to make any levy at all.   In *Hanscom v. Hinman,* 30 Mich., 419, and some other cases sales have been set aside for irregularities, but only on a showing that the complainant had offered to do equity to the tax-purchaser.   In *Conway v. Waverly,* 15 Mich., 257, relief was refused to a tax-payer who asked to have the collection of his taxes restrained on a showing that a portion of them were illegal, without distinguishing the legal from the illegal.   This case was followed in *Pillsbury v. The Auditor General,* 26 Mich., 245, in which the broad doctrine is insisted upon and enforced that he who demands relief from his taxes has no standing in a court of equity unless he offers to perform what is equitable.

If this complainant had shown that its property was excessively valued, and that the opportunity to be heard on the question of valuation had been lost by failure of the supervisor to comply with the law, the case would have been different. Nothing of that sort is pretended. We have a right to assume from all that appears in the bill that nothing has been lost by the irregularity, and that nothing is demanded from complainant but what it should pay.

The relief here is demanded as a strictly legal right; it being assumed that if the legal objection to the tax is valid, an equity necessarily springs from it.    I do not think so. Even in the case of a tax made excessive with fraudulent intent, we have required the person complaining of it to offer to pay that which was equitable before having relief from the remainder.  *Merrill v. Humphrey*, 24 Mich., 170. And it cannot be pretended that one who is irregularly taxed, but not unfairly, has any greater claims upon a court of equity than one who is taxed both fraudulently and unequally.

I agree in the conclusion reached by my brother Marston.    I also agree in what has been many times said by the Supreme Court of Illinois; that equity will not interfere to restrain the collection of the public revenue for mere irregularities.    Either it should appear that the property is exempt from taxation, or that the levy is without legal power, or that the persons imposing it were unauthorized, or that they have proceeded fraudulently.  *Du Page v. Jenks*, 65 Ill., 275, 286, and cases cited; *Munson v. Miller*, 66 Ill., 380, 383.    In the case first named one of the objections to the tax was very similar to that here taken.    It was that the assessors had not called on the tax-payer for a list of his taxable property as was required by law; and it was justly held that this afforded no ground for equitable relief.    The same rule was laid down in *State Railroad Tax Cases*, 92 U. S., 575.    And see *Cedar Rapids, etc., R. R. Co. v. Carroll Co.*, 41 Iowa, 153.    In Canada it has been held in a well reasoned opinion that a failure to make an assessment by the day prescribed was not fatal, though the statute in terms required it to be made not later than the day named.  *Nickle v. Douglas*, 35 U. C., Q. B., 126.

GRAVES, J., concurred.

CAMPBELL, J. (dissenting).    A bill was filed in the circuit court for the county of Houghton, and a decree was made upon it, enjoining defendants from selling certain lands for the taxes of 1874.

The facts show that the assessment roll of the township of Franklin was not drawn up and put into shape until after the time allowed for its review by the supervisor, who at that time had made no roll for 1874, but had, assuming his own testimony to be correct, which is in some respects contradicted, done these things and no more:

He had taken the roll of 1873, which was one of the official records of his office, and was required by law to remain there, and had made pencil changes upon it to make it correspond to what he meant to make the roll of 1874 to contain.    These changes were made before the time for review.    He testifies that the roll which he afterwards drew off and certified officially, was copied from this changed roll of 1873.

If this did not constitute such a roll as would support a tax-sale, then the case is within the settled decisions of this court, and the injunction was properly granted.    *Kinyon v. Duchene*, 21 Mich., 498, and cases cited.

The question therefore arises whether it is necessary under our laws that an assessment roll shall be made out in time to be exhibited to tax-payers at the period fixed for review, or whether it is competent to make it out afterwards.

The proceedings of supervisors in assessing taxes have been for a long time regulated by laws not substantially different, and the course of business has conformed in general to the legal order.    The supervisor is required on or before the second Monday of May in each year to obtain from the parties to be assessed, or otherwise, all the data necessary to make out an accurate assessment, and he is required to proceed immediately and "set down" the valuations.    In case of absence of parties or their neglect "*during the time the assessment roll is required by law to be made*" the supervisor is authorized to *set down and assess* the proper amount according to his best judgment.    Comp. L., § 985.

On the third Monday in May and for two more days each supervisor is required to be present at his office, for the purpose of "*reviewing his assessment;*" and as the law then

stood, as well as now, he could make any alteration which was shown to be just and proper. § 986.

When he had "*reviewed and completed the assessment roll*," it was made his duty to attach the statutory certificate of correctness. § 991.

There is no provision of law allowing him to make changes at any other time, and they would be illegal if made. *Griswold v. Union School Dist. of Bay City*, 24 Mich., 262.

The statute not only requires the Auditor General to furnish blanks, which are to be supplied to each supervisor before the first Monday of April (§ 988), but the law is explicit as to the manner of assessment, and how the roll shall be arranged. It prescribes how lands shall be described and separately valued; it requires realty and personalty to be kept separate; it directs non-resident property to be placed "*on a part of the roll separate from that upon which the estates of residents are entered,*" and assessments to persons in a representative character are not allowed to be mingled with their individual assessments (§§ 987–990).

It is plain from the course of the statutes that the roll is to be ready for exhibition at the time of review in the shape it is intended to be certified in, so that if no changes are suggested the certificate may be at once appended. It is an official document which the parties have a right to inspect, and which they have an equal right to assume will remain unaltered unless changed at the time of review. It cannot any more than any other record be subject to the risks of having substituted for it any alleged copy, perfect or imperfect. When the roll has been reviewed the law evidently regards it as a completed record to which the certificate must be appended, and not as the material for a new roll, which no one has an opportunity of inspecting or correcting.

As long as the action of the supervisor is preparatory and not put in formal shape, it can in no case be regarded as an assessment. It is not a roll simply because it is on paper. A record for one year cannot be made to do double

duty and become a roll for two years. At best it would be no more than a memorandum. The only assessment roll known to the law is the one certified, and the only roll which the supervisor can certify is the one which has been exhibited for review.

The person who visited the supervisor to examine the assessment testifies that nothing was shown to him. The supervisor testifies that if he showed anything (upon which he is pretty positive) it was the roll of 1873 as altered in pencil. There is no doubt whatever that no other roll then existed, and that the certified roll was made up in full thereafter, by copying these data.

Assuming (what would perhaps be a somewhat strained presumption) that the roll of one year could be so corrected as to represent accurately all that should appear in another with the necessary changes caused by deaths, removals, changes of possession and business casualties, the fact still remains that there was no roll exhibited or capable of exhibition at the review day, and that nothing then appeared which there was any certainty would reappear, or which in case of the death or misconduct of the supervisor could be identified for assessment purposes. Such a document cannot be upheld as an assessment on any principle which will not render the action of public taxation dependent on parol evidence and equally valid when intended as when executed. Such we think cannot be the law.

The death or removal of the supervisor at the close of the time allowed for review would have left no official document whatever which could have stood as his act. His memoranda would have been quite as regular if made up on detached pieces of paper out of which the roll could be afterwards compiled. It would be impossible for any to know what shape the assessment roll would afterwards take. There is no law which requires the preservation of any preliminary papers, and no one could prove by reliable testimony whether the final roll did or did not correspond with the papers out of which it was compiled, or whether changes were made before or after the review, or what papers existed on the review day. There should be permanent and official

records of all action which relates to the raising of taxes, which is the most important function of government, and one which must conform its action to fixed rules. It would be dangerous to leave private rights subject to action of this kind, without providing amply against official mistakes as well as misconduct; and there is no proceeding as important as the preparation of the roll on which all taxes depend.

I think the decree was correct, and that it should be affirmed with costs.